IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 66229-5-I |
| | ) | |
| Respondent, | ) | ORDER DENYING MOTION |
| | ) | FOR RECONSIDERATION, |
| v. | ) | GRANTING MOTION FOR |
| | ) | EXTENSION OF TIME, |
| MICHIEL GLEN OAKES, | ) | AND WITHDRAWING AND |
| | ) | SUBSTITUTING OPINION |
| Appellant. | ) | |

Michiel Glen Oakes filed a motion to reconsider the opinion filed on

December 22, 2014. The State of Washington filed a motion for an extension of

time to file an answer to the motion for reconsideration. The panel has

determined that the State's motion for an extension of time to file an answer to

the motion for reconsideration should be granted. The panel has further

determined that Oakes' motion for reconsideration should be denied but the

opinion filed on December 22, 2014 shall be withdrawn and a substitute opinion

filed. The substitute opinion includes the following amendments:

The first sentence of the opening paragraph on page 1 that states:

SCHINDLER, J. — A jury convicted Michiel Glen Oakes of
premeditated murder in the first degree of Theodore Mark Stover.

shall be replaced and amended as follows:

SCHINDLER, J. — Following a four-week trial, the jury convicted Michiel Glen Oakes of premeditated murder in the first degree of Theodore Mark Stover.

The two sentences before the block quote on the bottom of page 7 that state:

> Poor said Stover was a stickler for going slow and it was very odd he did not wave or stop. Poor said that after the station wagon left, she went to use the bathroom in the house.

shall be replaced and amended as follows:

> Poor said Stover was a stickler for driving slowly and it was very odd he did not wave or stop. Poor said that after the station wagon left, she went to use the bathroom in the house. As Poor approached the house, she smelled the strong odor of bleach.

The first three paragraphs on page 10 that state:

> The surveillance video shows Oakes returning to the Mount Vernon Lowe's at 4:51 p.m. Oakes is driving his black Suzuki. He is wearing black gloves and blue jeans. A Lowe's receipt shows that Oakes returned the bolt cutters at 4:54 p.m.
>
> Surveillance videotape from the Swinomish Northern Lights Casino from October 28 shows a black Suzuki SUV entering at 12:04 p.m. and driving down a dead end road that leads to the Swinomish Channel. The casino surveillance video shows a white station wagon driving into the casino parking lot at 6:21 p.m.
>
> The next day, Stover's employees found Stover's dog Dingo outside in the carport, "bloody" and "rasping," and she could "hardly breathe" or stand. Stover usually took Dingo with him when he went to Seattle, and Dingo was never outside alone. One of Stover's employees took Dingo to the veterinarian.
>
> After repeatedly trying to contact Stover and talking to Stover's employees on October 29, Stover's fiancée Theresa Vaux-Michel contacted the Skagit County police to report Stover and his white station wagon were missing.

shall be replaced and amended as follows:

> Surveillance videotape from the Swinomish Northern Lights Casino from October 28 shows a black Suzuki SUV entering at 12:04 p.m. and driving down a dead end road that leads to the Swinomish Channel. Surveillance video shows Oakes returning to

2

the Mount Vernon Lowe's at 4:51 p.m. Oakes is driving his black Suzuki. He is wearing black gloves and blue jeans. A Lowe's receipt shows that Oakes returned the bolt cutters at 4:54 p.m. The casino surveillance video shows a white station wagon driving into the casino parking lot at 6:21 p.m.

The next day, Stover's employees found Stover's dog Dingo outside in the carport, "bloody" and "rasping," she could "hardly breathe" or stand. Stover usually took Dingo with him when he went to Seattle and Dingo was never outside alone. One of the employees took Dingo to the veterinarian.

Stover's fiancée Theresa Vaux-Michel repeatedly tried to contact Stover on October 28. After talking to Stover's employees on October 29, Vaux-Michel contacted the Skagit County police to report Stover and his white station wagon were missing.

The last full paragraph on the bottom of page 15 that states:

Lead Detective Dan Luvera testified that the officers found three .22 caliber shell casings outside Stover's home in the carport area. The shell casing brand was stamped with a "C". On February 27, 2010, Stover's sister and niece found other shell casings outside the house. Detective Luvera located a shell casing wedged in between the boards on an outside deck and two other casings nearby. Detective Luvera said the shell casings were the same "CCI brand."

shall be replaced and amended as follows:

Lead Detective Dan Luvera testified that he found three .22 caliber shell casings outside Stover's home near the carport. Detective Luvera located a shell casing wedged in between the boards on an outside deck and two other casings nearby. The three shell casings were the same "CCI brand."

The third sentence in the second paragraph on page 17 that states:

Thompson said Oakes looked disheveled when he arrived at Starbucks and was typically very meticulous about his appearance.

shall be replaced and amended as follows:

Thompson said Oakes was typically very meticulous about his appearance, but he looked disheveled when he arrived at Starbucks.

The second sentence in the first paragraph on page 23 that states:

3

The defense conceded there was no contact between Stover and Opdycke after he was convicted of stalking.

shall be replaced and amended as follows:

The defense conceded there was no contact between Stover and Opdycke after he was convicted of stalking in April 2008.

The second to last paragraph on page 23 through the second paragraph on page 24 that states:

Oakes testified. Oakes said that he was an expert in firearms, "shot competitively," and had written "over 230 . . . articles for gun magazines." Oakes testified that he knew about interchangeable barrels and suppressors.

Oakes testified at length about Opdycke's concerns about Stover and the documentation she provided to him, including surveillance showing Stover at her house in Winthrop, the incident with John Bonica, the DVPO, the stalking conviction, and a risk assessment prepared by John Hansen. In a September 15, 2009 statement from Hansen and the Hansen Investigation Agency, Hansen states that "Opdycke's personal safety continues to be at high risk." The court instructed the jury that it could consider the evidence of Stover's behavior toward Linda Opdycke "only for the purpose of determining whether Mr. Oakes was aware of that alleged behavior and whether that awareness lead Mr. Oakes to a reasonable belief that he was in imminent danger of great bodily harm of Mr. Stover at the time of Mr. Stover's homicide."

Oakes testified that shortly after he met Opdycke, she showed him all the documentation she had "regarding her stalking situation" with Stover. Oakes said Opdycke told him Stover was "always armed with at least one firearm." Oakes testified Stover had no contact with Opdycke after the stalking conviction and he never told her about any contact that he had with Stover "up to and including October 28."

shall be replaced and amended as follows:

Oakes testified that he was an expert in firearms, "shot competitively," and had written "over 230 . . . articles for gun magazines." Oakes said that he knew about interchangeable barrels and suppressors. Oakes testified that his Browning automatic .22 "accepted" a silencer. Oakes said "[j]ust the addition of a barrel is not bulky" but it would be "difficult to draw from a holster."

4

Oakes testified that shortly after he met Opdycke, she showed him all the documentation she had "regarding her stalking situation" with Stover. Oakes testified at length about Opdycke's concerns about Stover and the documentation she provided to him, including surveillance showing Stover at her house in Winthrop, the incident with John Bonica, the DVPO, the stalking conviction, and a risk assessment prepared by John Hansen. In a September 15, 2009 statement from Hansen and the Hansen Investigation Agency, Hansen states that "Opdycke's personal safety continues to be at high risk."

The court instructed the jury that it could consider the evidence of Stover's behavior toward Linda Opdycke "only for the purpose of determining whether Mr. Oakes was aware of that alleged behavior and whether that awareness lead Mr. Oakes to a reasonable belief that he was in imminent danger of great bodily harm of Mr. Stover at the time of Mr. Stover's homicide."

Oakes said Opdycke told him Stover was "always armed with at least one firearm." Oakes testified Stover had no contact with Opdycke after the stalking conviction and he never told her about any contact that he had with Stover "up to and including October 28."

The first full sentence on the top of page 25 that states:

Oakes carried the backpack and had a .9mm handgun "at the small of [his] back" and a .22 caliber Browning pistol on his right hip.

shall be replaced and amended as follows:

Oakes carried the backpack and was armed with two firearms, a 9 mm handgun "at the small of [his] back" and a .22 caliber Browning pistol in a holster on his right side.

The first two sentences of the first full paragraph on page 25 that state:

Oakes said he arrived at Stover's home at 7:00 a.m. Oakes testified that Stover, accompanied by his dog Dingo, led him down the hallway and told him to stand in the bathroom.

shall be replaced and amended as follows:

Oakes said he arrived at 7:00 a.m. and Stover, accompanied by his dog Dingo, opened the door, led him down the hallway, and told him to stand in the bathroom.

5

The first paragraph after the first block quote on page 26 through the first paragraph on page 27 that states:

> Oakes said Stover landed face-up in the hallway. Oakes testified, "I took . . . my glove off my hand and touched his throat and he, he, he, he didn't have any pulse." Oakes paced around then he moved the body to the bedroom to "have time to think." Oakes said he did not clean up.
>
> > He wasn't even bleeding that I could see at that point. There wasn't anything to clean up that I could see. I put his gun on his chest and paced around for a little while. And then I heard the engine running for the car and I thought for some reason I needed to shut it off or something. And I went out the door.
>
> Oakes then dragged the body to the trunk of Stover's white station wagon and put Stover's gun in Stover's vest pocket. Oakes testified that he decided to move Stover "so no one calls the cops right away." Oakes testified that while he was outside, Stover's dog Dingo "came at me and I shot a couple times until it stopped coming at me." Oakes testified that the silencer might have been on the gun. Oakes said the van was gone when he came out of the house. Oakes put Stover's hat and coat on and drove away in the white station wagon.

shall be replaced and amended as follows:

> Oakes said Stover landed face-up in the hallway. Oakes testified, "I took . . . my glove off my hand and touched his throat and he, he, he, he didn't have any pulse." According to Oakes, he paced around then he moved the body to the bedroom to "have time to think."
> Oakes said he did not clean up.
>
> > He wasn't even bleeding that I could see at that point. There wasn't anything to clean up that I could see. I put his gun on his chest and paced around for a little while. And then I heard the engine running for the car and I thought for some reason I needed to shut it off or something. And I went out the door.
>
> Oakes said the van was gone when he came out of the house and he dragged the body from the house to the trunk of

Stover's white station wagon. Oakes testified that he put Stover's gun in Stover's vest pocket. Oakes said he decided to move Stover "so no one calls the cops right away."

Oakes testified that when he went outside, the dog "was staring at me very, very intently" and "making some sounds and kind of approaching. And so I drew the gun that I had on my right side" and shot Dingo with the automatic Browning .22. Oakes testified that the "hole in the bottom" of his holster accommodates the Browning .22 and silencer.

Q. What was the dog doing?
A. It was standing not far away from me and it was starting at me very, very intently and it, it was making some sounds and kind of approaching. And so I drew the gun that I had on my right side.
Q. Is that the first time you'd drawn your gun?
A. Yes.
Q. What gun was that you had on your right side?
A. The was the .22.
Q. Would that .22 have even fit in your holster with a silencer on it?
A. My holster has a hole in the bottom. It might. I don't know.
Q. Okay. So did you shoot Dingo?
A. Dingo came at me and I shot a couple times until it stopped coming at me. And then I stopped shooting and it — well, it stopped coming toward me and I stopped shooting.
Q. This is the Browning. So what side do the shell casings eject from?
A. The right side.
Q. Did you think to pick up your shell casings?
A. No.

Oakes also testified he saw "people walking around" and he was surprised no one responded after he shot Dingo.

And I looked down the driveway and I see people walking around and I'm thinking, they should be coming up here. I mean, I just shot a gun and my ears were ringing from the shot in the carport. They should have come. So I think, well, they're going to come any minute now. I, I just need to go someplace and think about what to do about this.

7

Oakes put Stover's hat and coat on and drove away in the white station wagon.

The first sentences on page 47 that states:

After shooting Stover, the evidence showed Oakes used bleach to try to clean up, shot Stover's protection dog Dingo with his Browning .22 and silencer, then put on Stover's hat and coat as a disguise before loading Stover into the white station wagon and driving away.

shall be replaced and amended as follows:

The evidence and reasonable inferences from the evidence also show that after shooting Stover, Oakes used bleach to try to clean up, shot Stover's protection dog Dingo with his Browning .22 and silencer, then put on Stover's hat and coat as a disguise before loading Stover into the white station wagon and driving away.

Now, therefore, it is hereby

ORDERED that the State's motion for an extension of time to file an answer to the motion for reconsideration is granted. It is hereby further

ORDERED that Oakes's motion for reconsideration is denied and the opinion filed on December 22, 2014 shall be withdrawn and a substitute opinion filed.

DATED this _18th_ day of _May_, 2015.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| STATE OF WASHINGTON, | ) | No. 66229-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MICHIEL GLEN OAKES, | ) | |
| | ) | |
| Appellant. | ) | FILED: May 18, 2015 |

SCHINDLER, J. — Following a four-week trial, the jury convicted Michiel Glen

Oakes of premeditated murder in the first degree of Theodore Mark Stover. Oakes

contends the court erred in (1) denying his motion to suppress the warrantless seizure

of a white plastic bag he threw over an embankment, (2) permitting the State to use a

previously suppressed text message for impeachment purposes, and (3) excluding

evidence in violation of his right to present a defense. Oakes also claims the State did

not disprove his claim of self-defense beyond a reasonable doubt, juror misconduct

denied him a fair trial, and the preliminary appearance in district court violated his right

to counsel and his public trial rights. We affirm.

FACTS

Theodore Mark Stover was a well known and talented dog trainer. Linda

Opdycke met Stover in 1991. In 1992, Stover and Opdycke formed a partnership to

operate a dog training and boarding facility on Kiket Island near LaConnor, Stover and Opdycke LLC. Stover trained and took care of the dogs. Opdycke ran the business.

In 2002, Stover and Opdycke married. In September 2005, Opdycke moved out of the main residence to a guesthouse on Kiket Island. Opdycke said she moved to the guesthouse "in hopes . . . we might be able to possibly fix something and Mark might understand the gravity of the situation and . . . work further on the relationship. And that did not happen." Opdycke told Stover in April 2006 she wanted a divorce. "He wasn't getting help on his anger and rages and the problems we were having in our personal relationship, and so I decided it was time for me to go."

In December 2006, Opdycke bought a house in Winthrop. In the spring of 2007, Opdycke contacted Stover about whether he "wanted any wedding items." Opdycke said they had two wedding albums and a candle from the wedding. According to Opdycke, Stover said that "he did not want any of those things." Opdycke took the photographs "because . . . I wanted to be able to go through them and see if any photos of friends or families that I wanted out of them before disposing of them." Opdycke said she threw the wedding candle and a framed wedding photograph in the dumpster. Opdycke said Stover called "and he was quite upset that I had thrown the items away."

In May 2007, Stover moved his boarding and dog training business to a temporary location in Anacortes. In August 2007, Opdycke filed a petition for a decree of dissolution. According to Opdycke, Stover drove "18 hours straight from a fishing trip in Montana" to her house in Winthrop to tell her "he could not let the marriage go. And he was very emotional, very distraught, on his knees next to my bedside. And he had a pistol in his hand and laid it on the pillow next to my head." Opdycke "tried calming him

2

down and talking with him and telling him that it would be okay." Opdycke said Stover settled down after a few hours and left at her request.

Opdycke said that Stover repeatedly demanded she return the wedding photographs. Opdycke said he harassed and stalked her, showing up inside her home a number of times uninvited. Opdycke testified that on November 19, 2007, she spent the night with a friend of Stover's, John Bonica. The next day, Stover called and said he would not agree to a divorce, and then described some of the intimate details from the night before.

In November 2007, Opdycke contacted the Winthrop police to report that Stover was coming to her home without her permission. Opdycke said she then received a form from Stover cancelling her health insurance with a handwritten note stating, "Next time do not call the cops on the guy that controls your healthcare." Opdycke changed all her locks on the house and installed a security surveillance system.

On November 23, 2007, Bonica sent an e-mail to Opdycke stating that after a "long and very frank" conversation with Stover, he could not see Opdycke any more "for your safety, . . . for my children's sake and for my own." Bonica encouraged her to "take all necessary steps to secure your own safety."

On January 14, 2008, the court entered the decree of dissolution. In a January 22, 2008 phone message to Opdycke, Stover states, "This is war, this is god damn war. You're wrecking my life, you've wrecked my life enough. If you want it, you've got it, if it is the second to the last thing I do." In a February 14, 2008 phone message to Opdycke, Stover states:

> If I ever for whatever means find out that you are still in possession of those wedding things, I don't care if it is 5, 10, or 20 years from now I'm

3

coming to see you big time. You got your god damn divorce, but I better not ever find out that you are in possession of those wedding pictures or I will never forget this and you know I am a guy that can hold a grudge until I am dead.

In March 2008, Opdycke's neighbors caught Stover stealing trash from the containers located at the bottom of her driveway. The State charged Stover with stalking and theft. On April 7, 2008, the Okanagan County District Court entered a domestic violence protection order (DVPO) prohibiting Stover from contacting Opdycke and possessing a firearm or ammunition. The DVPO was in effect in until April 6, 2010. Stover entered an Alford[1] plea for stalking. The court sentenced Stover to two years of probation and to complete a 12-month anger management program. There is no dispute that Stover did not contact Opdycke after entry of the DVPO.

Michiel Glen Oakes lived in Kennewick with three of his four children and worked in sales for an Internet service provider. Oakes met Opdycke for the first time in July 2008 at a Starbucks in Yakima. Oakes previously owned a business that developed "force on force training" and was a consultant in tactical training and contingency planning. Oakes said he trained law enforcement and was an adjunct instructor for the military "utilizing force on force technology," and "provided all sorts of close quarters combat related survival training." Oakes said that experience "enabled me to learn a lot about surviving violent conflicts."

In fall 2008, Stover purchased four acres of property in Anacortes located on Thompson Road. The property had a house, a barn with indoor and outdoor kennels, and a fenced area for the dogs to run.

Opdycke told Oakes about her "harassment and stalking situation" with Stover

---

[1] North Carolina v. Alford, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

4

and asked him to assess the steps she had taken. Opdycke told Oakes Stover was obsessive and highly intelligent and she was "very concerned that his mental state would deteriorate." Opdycke gave Oakes a number of documents, including the DVPO, transcripts of phone messages from Stover, and letters she had written to law enforcement. Opdycke and Oakes began dating and by spring 2009, Oakes was spending a significant amount of time at Opdycke's home in Winthrop.

Oakes testified that he first met Stover at approximately 10:00 a.m. on a Tuesday or Wednesday in May 2009. According to Oakes, Stover approached him in the parking lot of the Kennewick Costco and said that "I was going to do something for him, . . . I was to get some wedding pictures for him from Ms. Opdycke and I was to meet him at the Northgate Mall" on July 14, "and everything would be okay with me and my kids."

Oakes testified he looked for the wedding photographs and could not find them, but went to the Northgate Mall on July 14. Oakes testified that Stover was calm but said Oakes "hadn't tried" and Stover "would be in touch."

Oakes testified that in mid-August 2009, he and Opdycke went to Montana to look for property and to visit her father. Oakes testified that on August 10 while he was in line at the grocery store near Whitefish, Montana, he saw Stover. Oakes testified that Stover was angry because he felt Montana was "his state and that we shouldn't think about relocating there." According to Oakes, he agreed to meet Stover in late September at a church parking lot in Anacortes. Oakes testified that Stover did not show up to the September meeting but called a few weeks later and told him to bring the wedding photographs at midnight on October 24.

Oakes made arrangements to meet with his ex-wife Jennifer Thompson the

evening of October 24 at her house in Everett. Oakes left her house after 10:00 p.m. to go meet Stover. Oakes said unlike previously, Stover was agitated and "angry that I had not brought him the pictures." Oakes told Stover that the photographs "must be in the safe because I looked every place else." Oakes said Stover was "frightening that night." Oakes testified that Stover asked him to bring the photographs to his house on October 28 at 7:00 a.m., and told him to park in the church parking lot and walk the quarter-mile to Stover's house. Oakes never told Opdycke or the police about any of the encounters with Stover.

Oakes left Opdycke's house in Winthrop at around 2:30 a.m. on October 28. Surveillance video from the Mount Vernon Walmart shows Oakes driving his black Suzuki SUV[2] into the Walmart parking lot at 5:16 a.m. on October 28. Oakes enters the store wearing a black coat and jeans. The Walmart receipt shows that at 5:36 a.m., Oakes purchased a backpack, camouflage pants and sweatshirt, an anchor rope, ankle weights, and shin guards.

Stover always had scheduled dog-training appointments in Seattle on Tuesday and Wednesday. On Wednesday, October 28, 2009, Malena Skultety arrived at work at 7:50 a.m. Stover's other employees, Amber Baker and Stephanie Poor, were also scheduled to work that day.

Baker arrived at around 8:00 a.m. Baker drove the "company van to and from Seattle picking up and delivering dogs." Baker did not think Stover would still be at home. When Baker talked to Stover the night before, he told her he was leaving the next morning around 7:30 a.m. for a 9:00 a.m. appointment in Seattle and would see her when he returned. Stover typically drove his BMW to Seattle. Baker said that when

_____
[2] Sport-utility vehicle.

she talked to Stover the night before, he was in a great mood and was excited and proud about changes to the business.

After Baker arrived at 8:00 a.m., she said the "dogs outside just started going absolutely crazy." She walked to the kennels, "trying to get them to be quiet." On her way back, Baker noticed Stover's white station wagon was parked in an unusual place. The station wagon was backed up to the BMW parked in the carport, instead of further down the driveway. Baker assumed Stover was still home and tried to go into the house but the door was locked. Baker said the door was never locked. After Baker noticed a small area with blood on the ground behind where the station wagon was normally parked, she assumed Stover's dog Dingo "had opened her incision because she had had a surgery like a week or two before" and Stover was inside taking care of the dog. Baker left and drove the van to Seattle.

Stephanie Poor arrived at work after Baker left. At around 8:20 or 8:30 a.m., Poor was walking several of the dogs when she saw a man "who I thought I believed was Mark because it was wearing -- it was Mark's hat [and coat] -- coming and going from the house, carrying big things, putting it in the back of the [station wagon]." Poor said she thought it was strange the man "almost peeled out" and "shot down the driveway" in the station wagon without stopping to talk to her or waving. Poor said Stover was a stickler for driving slowly and it was very odd he did not wave or stop. Poor said that after the station wagon left, she went to use the bathroom in the house. As Poor approached the house, she smelled the strong odor of bleach.

> Before I got to the door, I could smell bleach, which was very odd because we're on septic out there and you do not use bleach, any type of bleach cleaner on a septic. And Mark didn't use bleach cleaner on septic either. It was overpowering. I could smell it before I even got to the door.

7

After Poor entered the house, she "saw three wet spots on the entry mat in the hallway which were -- obviously had been cleaned and were blood -- they had a red tint to them." She said the bathroom was "completely immaculate and the smell of bleach was overwhelming." Poor said she "looked around the kitchen to see if there was anything amiss because it was an odd morning. I surveyed the house. It didn't look like anything was out of place."

Skultety also said that as soon as she walked into the house on October 28, "there was a very strong odor of bleach, and down the hall were wet spots that looked like they were cleaned."

Surveillance video at the Mount Vernon Lowe's store shows Oakes driving Stover's white station wagon into the parking lot at 9:43 a.m. on October 28. Oakes enters Lowe's wearing a black fleece coat and camouflage sweatpants. A Lowe's receipt shows that at 9:50 a.m., Oakes got a pair of bolt cutters. Oakes exits the store at 9:52 a.m. and leaves the Lowe's parking lot in the white station wagon.

Sometime before noon, Sharon Larsen and her daughter Tammy Gilden stopped at the Summit Park Grange. The grange is located about a half-mile from Stover's house. A chain and a lock cordon off the area in back of the grange. Larsen and Gilden noticed two cars parked a couple of feet apart, back-to-back, in the cordoned off area behind the grange building—a white station wagon and a black SUV. The back ends of both vehicles were open. Larsen testified that a man with dark hair "had his arms around this big huge roll of plastic," and he was going back and forth between the two vehicles. Gilden said it was "a big roll of plastic, a big 60 foot long wide roll of plastic, . . . like a rug."

8

Gilden called 911 to report a trespass. When the SUV left a few minutes later, Larsen wrote down the license plate number. Skagit County Sheriff Deputy Patrick Duhaime responded. The black SUV was gone but the white station wagon was still parked behind the grange. Deputy Duhaime ran the license plate numbers for the vehicles. Stover was the registered owner of the white station wagon. Oakes was the registered owner of the black Suzuki SUV. Deputy Duhaime examined the cable and the chain wrapped around the post of the cordoned off area. Deputy Duhaime found the "last length connecting the cable to the chain had been cut and separated." The keys to the white station wagon were on the seat, a blanket was stretched out in the back of the car, and the car smelled like dogs had been in it.

At approximately 12:30 p.m., Deputy Duhaime saw the black Suzuki SUV and pulled the car over. Oakes "denied being behind the [grange]. He said that he'd stopped in the parking lot to make a phone call. He was looking for the casino." Deputy Duhaime returned to his patrol car to run a driver's license check. Deputy Duhaime then told Oakes that "I thought he was actually camping behind the grange. I thought it was him. He'd been seen back there . . . . I gave some time to move his [white station wagon] out of there." Deputy Duhaime said Oakes was wearing sunglasses and a slick black nylon or fleece pullover with a zipper at the neck that had light-colored dog hair on the sleeve. Deputy Duhaime said the windows were tinted but he could see there were "blankets or a sleeping bag in the back" of the SUV. Oakes told Deputy Duhaime that "he was going back to the casino for a few minutes, and then he was headed to Everett." Deputy Duhaime said that throughout the encounter, Oakes "was nervous."

Surveillance videotape from the Swinomish Northern Lights Casino from October

28 shows a black Suzuki SUV entering at 12:04 p.m. and driving down a dead end road that leads to the Swinomish Channel. Surveillance video shows Oakes returning to the Mount Vernon Lowe's at 4:51 p.m. Oakes is driving his black Suzuki. He is wearing black gloves and blue jeans. A Lowe's receipt shows that Oakes returned the bolt cutters at 4:54 p.m. The casino surveillance video shows a white station wagon driving into the casino parking lot at 6:21 p.m.

The next day, Stover's employees found Stover's dog Dingo outside in the carport, "bloody" and "rasping," she could "hardly breathe" or stand. Stover usually took Dingo with him when he went to Seattle and Dingo was never outside alone. One of the employees took Dingo to the veterinarian.

Stover's fiancée Theresa Vaux-Michel repeatedly tried to contact Stover on October 28. After talking to Stover's employees on October 29, Vaux-Michel contacted the Skagit County police to report Stover and his white station wagon were missing. Deputy Duhaime recognized the white station wagon from the complaint the day before and drove back to the grange. The white station wagon was gone, and the "cable was dropped on the ground . . . . The day before when I was there, the cable was hanging on the lock."

At approximately 3:30 p.m., police officers located Stover's white station wagon parked in the parking lot of the Swinomish Northern Lights Casino. The casino is located about three miles from Stover's house. There was blood on the rear of the car. Officers impounded the station wagon.

Skagit County Detective Ben Hagglund interviewed Stover's employees and learned that Stover's ex-wife Opdycke was dating a man named Michiel. Skagit County

10

Detective Tobin Meyer contacted Okanagan County Sheriff Office Chief David Rodriguez and Sergeant Eugene Davis. Detective Meyer asked Chief Rodriguez and Sergeant Davis to drive to Opdycke's house to try and locate Oakes' black Suzuki SUV while Detective Meyer obtained a warrant to search the car.

Chief Rodriguez and Sergeant Davis arrived at Opdycke's house in Winthrop at 7:40 p.m. Chief Rodriguez saw the SUV in the driveway. Opdycke invited the officers inside. Chief Rodriguez told Opdycke and Oakes Stover was missing and Skagit County police were looking for Oakes' SUV. Opdycke said she and Oakes were planning to leave to go to Portland, Oregon. Chief Rodriguez asked Oakes and Opdycke to wait until he obtained the search warrant to search the SUV. Sergeant Davis went outside to get cell phone reception to call Detective Meyer.

Meanwhile, Oakes told Chief Rodriguez that he had to go outside to roll up his car's windows because it was raining. Chief Rodriguez said it was not raining and the windows in the SUV were up. Oakes then became "agitated" and began looking around the house, saying he needed to find his pills.

While Chief Rodriguez was talking to Opdycke, Oakes went outside. Sergeant Davis watched from the deck while Oakes removed a white plastic bag from the rear of the SUV. Sergeant Davis ran down the outside stairs and asked Oakes what he was doing. Oakes had the plastic bag in his right hand. As Sergeant Davis approached Oakes, Oakes walked to the passenger side of the SUV and "th[r]ew" the plastic bag "down the embankment." Chief Rodriguez detained Oakes. Sergeant Davis retrieved the plastic bag and placed it in the patrol vehicle. Sergeant Davis testified the bag smelled like bleach.

Detective Meyer and Detective Hagglund drove to Okanogan County. When they arrived at approximately 11:00 p.m., Sergeant Davis gave Detective Meyer the white plastic bag. Detective Meyer said the bag "had some holes in it, two holes. And I observed immediately that there was a firearm in the bag. You could see the sides that were poking through the bag." Officers arrested Oakes and drove him to the Skagit County Jail.

Police officers searched Stover's house that evening and the next day. There were bloodstains on the front porch, on the walls, on the carpet runners in the hallway, and in the bedroom. The odor of cleaning supplies was overwhelming. The police found Clorox Bleach and a spray bottle that appeared to have been used to clean up. Lead Detective Dan Luvera said he did not "find anything to indicate there was a struggle." During a search of Stover's BMW, police found a "customer phone list," a brass container with Stover's credit cards and driver's license, and Stover's cell phones on the front seat. Phone records showed the last call Stover made was the night before on October 27 at approximately 7:30 p.m.

On Friday, October 30, the district court found probable cause to detain Oakes. At the 7:00 a.m. preliminary hearing, the court advised Oakes that he was under investigation for the murder of Stover and that he had the right to an attorney at public expense. Oakes told the court he planned to retain private counsel. Later that day, the State filed a criminal complaint in district court charging Oakes with second degree intentional murder. The magistrate set bail of $5 million.

The following Monday, November 2, the district court judge advised Oakes that the State had filed a felony complaint for murder and that bail had been set at $5 million.

The court stated that if charges were not filed in superior court within 30 days, the charges would be dismissed. On November 4, a private attorney filed a notice of appearance and a motion to release Oakes on personal recognizance or reduce bail.

On November 13, 2009, the State filed an information in superior court charging Oakes with premeditated murder in the first degree of Stover. On November 25, the superior court arraigned Oakes on the charge of murder in the first degree. Oakes entered a plea of not guilty. Following the bail hearing, the court reduced the bail amount from $5 million to $2.5 million. Oakes posted bail and was released pending trial.

During the investigation, the police executed a number of search warrants, including a warrant to search Opdycke's home, the Suzuki SUV, and the white plastic bag. Divers and a cadaver dog searched the Swinomish Channel near the Northern Lights Casino for Stover's body several times without success.

On May 27, 2010, Oakes filed a "Notice of Intent to Rely on Defense of Self, Others or Property." Oakes filed a number of pretrial motions, including a motion to suppress the white plastic bag containing the .22 caliber Browning pistol and the evidence obtained from his computer that was seized from Opdycke's home, including text messages downloaded from Oakes' cell phone. Oakes argued that the search warrant affidavit did not establish a nexus between his computer and the crime. Following a CrR 3.6 hearing, the court granted the motion to suppress the evidence obtained from Oakes' computer. The court denied the motion to suppress the contents of the white plastic bag. The court ruled Oakes voluntarily abandoned the bag and, in the alternative, exigent circumstances justified the seizure. The court entered detailed

findings of fact and conclusions of law.

The four-week jury trial began on September 27, 2010. More than 50 witnesses testified and the court admitted into evidence more than 700 exhibits. The State called a number of witnesses, including Stover's fiancée Vaux-Michel, Skagit County police officers, Okanagan County Chief Rodriquez and Sergeant Davis, Stover's employees, the two women who saw Oakes at the Summit Park Grange, Oakes' ex-wife Jennifer Thompson, the veterinarian who treated Dingo, and Washington State Patrol Crime Laboratory (WSPCL) forensic scientists. The defense reserved giving an opening statement until the conclusion of the State's case in chief.

Stover's fiancée Theresa Vaux-Michel testified that she and Oakes met through a mutual friend and started dating in October 2008. Vaux-Michel described Stover as five-feet eight-inches tall and 175 pounds. Vaux-Michel said Stover was "a man of routine" and insisted on being on time. Vaux-Michel described Dingo as Stover's highly trained and beloved protection dog. She said that when Dingo was not with Stover, the dog was inside the house and was never outside when Stover was not home.

Vaux-Michel typically spoke to Stover three to five times a day. The last time she had any contact with Stover was when he called her on October 27, 2009 at approximately 7:15 p.m. Vaux-Michel said they talked for "a little over an hour." Vaux-Michel was very concerned the next day when she did not hear from Stover. "It was extremely unusual. I didn't hear from him all day. . . . [H]is first phone call was usually by 8:00 in the morning." Vaux-Michel said that when she had not heard from Stover the next morning, she "knew something was wrong." Vaux-Michel called and talked to one of his employees. When she learned that they had not seen him for 24 hours, that

14

Dingo was loose, and that "there was blood outside," she called the police.

Vaux-Michel testified that the previous weekend, Stover was upset and told her "things weren't right on his property."

> He knew something was amiss, and he came down and picked me up for dinner. We had dinner in the Redmond area. . . . When -- there was a great deal at the time that I knew that [M]ark was fearful for his life. He did not want me to be afraid, as well, and so I could tell when he was anxious. I could tell when he was fearful, but he did not want me to bear that.
>
> . . . .
> Q. What does that mean?
> A. Mark was worried. He said that someone was trying to kill him, and he knew he was being followed. He did not wish to leave a paper trail, so he used only cash. He would call me from pay phones, used a cell phone occasionally.

Vaux-Michel testified Stover would never park at the casino because he "had complete distain for gambling."

Detective Don McDermott testified that when he arrived at Stover's home on October 29, he saw blood stains on the porch, on the carpet running down the hallway, on the floor underneath the carpet, and in the bedroom. Detective Kay Walker testified there were blood stains on the wall in Stover's hallway, on a garbage can from the bathroom, and on the hose of a vacuum cleaner.

Lead Detective Dan Luvera testified that he found three .22 caliber shell casings outside Stover's home near the carport. Detective Luvera located a shell casing wedged in between the boards on an outside deck and two other casings nearby. The three shell casings were the same "CCI brand."

Detective Luvera testified that he did not find any guns or ammunition in Stover's house. On cross-examination, Detective Luvera testified Stover had registered 20 to 30 guns with the Washington State Department of Licensing and a friend of Stover's was

storing a number of guns for him. But Detective Luvera testified that he was not able to locate 5 of the .22 caliber guns registered to Stover.

Detective Meyer executed a search warrant on Opdycke's house and seized surveillance footage from her security system. The footage shows Oakes leaving the house on October 28 at 2:38 a.m. and not returning until 11:31 p.m. Detective Meyer seized a black nylon bag "next to a desk Linda Opdycke identified as Mike's area." The bag contained a number of items, including his passport, his checkbook, and "a 6.8 [special purpose cartridge] am[m]o casing." Detective Meyer testified he also found a September 30, 2009 invoice billing Oakes for a "Trial Light, four inch, threaded, end barrel, mate [sic] black, non-fluted, high-front sight" from "Tactical Solutions."

Okanogan County Sergeant Davis testified that when he asked Oakes why he was in the Skagit County area "near Mr. Stover's residence" on October 28, Oakes looked at Opdycke and said, "Don't worry, honey. I can explain. Then he went on to say that he went there to visit his ex-wife and her two sons." Oakes told Sergeant Davis he "did not get stopped" anywhere near the driveway of Stover's house.

> [Oakes] may have mentioned -- I asked him that he was seen or he was stopped near the driveway, and stated that he did not get stopped near Stover's driveway. That he was seen in a grange parking lot where two older ladies in a red . . . truck kept looking at him. He basically stated he pulled over to use his cell phone.

Oakes' ex-wife Jennifer Thompson testified. The couple married in 2007. Thompson has two young sons from a previous marriage. Thompson filed a petition for dissolution of the marriage in October 2008. The divorce was final in January 2009.

Thompson said in mid-October 2009, she contacted Oakes to ask whether he was "absolutely certain . . . that we're done" and Oakes told her "I'm not certain." Four

16

or five days later, Oakes contacted Thompson to tell her he would be in the area on October 24 and suggested they get together. Thompson said Oakes arrived at her house in Everett at around 7:00 p.m. and stayed for a couple of hours. Thompson knew Oakes trained SWAT[3] teams and law enforcement agencies. When he left, Oakes told Thompson that "he had some side work, a job that he was off to do, and that it was dangerous." Oakes e-mailed her the next day to tell her "he made it home, and all was well." Oakes then sent another e-mail to Thompson telling her, "I may have reason to be back in the area this week."

Oakes called Thompson around 12:30 p.m. on October 28. She agreed to meet him at a Starbucks in Everett around 1:15 p.m. Thompson said Oakes was typically very meticulous about his appearance, but he looked disheveled when he arrived at Starbucks. After talking for a bit, Oakes asked Thompson whether there was "a beach or ocean around here." The two drove in separate cars to the beach in Mukilteo. Oakes told Thompson that "his car was too full for me to ride in it." Thompson noticed Oakes' SUV was "caked with mud almost up to the windows" and that too was unusual because Oakes was "very . . . neat and [tidy]." Thompson said that Oakes was wearing a black fleece jacket. While they were at the beach, Thompson noticed Oakes' jacket was covered in animal hair, he had a "rusty-reddish stain on his right knee" of his jeans that "looked like blood," and he was carrying a gun.

After walking along the beach for 20 to 30 minutes, they stopped and sat down at one of the picnic tables. Oakes left to use the restroom. Thompson said that when he left, he was still "friendly and polite." But when Oakes returned, "he was noticeably

_____

[3] Special weapons and tactics.

17

stressed and worried, and he was in the bathroom for a long time." Thompson said:

> [Oakes'] whole demeanor had changed, and he was noticeably stressed. I think I asked what was wrong. And he said, I think I'm in trouble. And I said, like real trouble or like paranoid trouble? And he said, like felony, 10 to 15 years trouble. And I didn't know if he was being melodramatic or if it was something real.

Thompson testified Oakes was very "stressed out" and told her that "two old bitties" had seen him and "in 24 to 48 hours when the shit hit the fan his name was now associated to that area."

> He indicated that he was doing a job, and that the people that were helping him -- what was the order? He said he was doing a job and something went wrong. He made a mistake. Something that was not planned happened, and he made reference to two old bitties that had seen him, and the people that were helping him are not going to, and that he's all on his own. I don't remember the exact wording, but it was in that vein. . . . When he continued on, it made sense. He said that he was pulled over by a sheriff, I think. And this was bad because in 24 to 48 hours when the shit hit the fan his name was now associated to that area, and that's why it was bad. . . . At that point he was very, very stressed out, like rubbing his hair and just vigilantly looking all around, and I was quiet.

Thompson said when Oakes saw a police officer in the beach parking lot, he got "really freaked out" and said it was a "guilty conscious kind of thing."

> And then there was a policeman doing a patrol. And he was just in the parking lot in front of the lighthouse. And he got really, really, really, really freaked out, and I said, they don't know -- they don't know -- you know, we're just sitting in a parking lot. They're not concerned by you. He said, yeah, you're right. I should know. He said guilty conscious kind of thing, and I know that I have done something so I'm -- you're right. After that he had a really hard time sitting still, just that presence of that officer there.

After the police officer left, Oakes told Thompson that "[i]t was real trouble" and he needed to get out of the area, but he had to be somewhere at 6:00.

> He indicated it was real. It was real trouble. And he had made at some point a reference to he needed to get over the mountains because he lived in Kennewick. Here he is on the west side of the mountains. He needed to get out of the area. And I said, well,

18

what are you doing here? Why are you here? He said I need to be in the area. I have a couple of hours to kill. My memory is about 6:00 p.m. he needed to be somewhere. So he just had some time. He asked if there was a hardware store around, like a Lowe's or a Home Depot. I had just moved to the area, so even though I knew there was one, I didn't' know where it was. He was like, it's okay. I'll find it.

And he -- in talking about getting over the mountains, I kind of asked why don't you just go. He needed to be in the area. And then he -- I said, well, once you get home, how long do you need to be paranoid? How real is this? And he said, if I get pulled over, there is a fifty-fifty shot of me getting questioned. If I get questioned, there will be certainly a trial. And if there is a trial, it's not going to be good.

Q. Did he indicate if he had any choices or alternatives in terms of getting away?

A. Yeah. He said I have two paths. I asked him the timeline. I said, well, how long do you have to be worried? And he made a reference, I don't remember the exact time period he gave me, but he said, basically, for this amount of time I've really got to watch myself. For this amount of time -- if this amount of time goes by, then I'm probably clear.

And that was the path of if he just went straight home. He said I have two paths to cho[o]se from. One is quick, but I have to watch my back for a while. The other path, they most certainly won't -- you know, I'm in the clear -- and this is paraphrasing. I don't remember the exactly, I'm in the clear, but it's a very -- I remember this being so weird -- physically demanding, labor, hard, very hard, hard path, but then I'll be clear.

Oakes also told Thompson he needed "to get out of the area and sterilize what he had in the car. Because if they found that, he would go to life -- he'd go to prison for life. I didn't know what it was that he was referring to."

Thompson said she left between 3:30 and 4:00 p.m. to go get her children "and he stayed there." Thompson said Oakes called her later but she did not answer.

Thompson testified that she received a "very strange" e-mail from Oakes the next day on October 29 at around 6:00 p.m.

I got an email from him that really seemed strange because it was very, It was nice to see you. It was great listening to the Polka guy get rolling.

19

[H]ave a good evening. And it seemed really weird considering (a) the conversation we had, and (b) the reason we'd even met in the first place . . . . It was odd to me because it was -- it had nothing to do with like -- these two people that had this conversation. There was a certain response you would expect, reference to or -- I don't know. It seemed like he was very vague and strange. He was like, Nice to see you. See you later. Got to go.[4]

Detective Meyer testified that during the search of the SUV, officers found the Walmart receipt for the purchase of a camouflage sweatshirt and sweatpants, ankle weights, an anchor line, a backpack, and shin guards in the center console; the backpack; and a suitcase on the back seat. Detective Meyer testified that officers did not find the anchor line, camouflage sweatpants and sweatshirt, or ankle weights Oakes purchased at Walmart. In the rear storage area of the vehicle, Detective Meyer found a cleaning manual for a Sparrow sound-suppressing silencer.

Detective Kay Walker testified that the suitcase contained a bulletproof vest, 9 mm magazines, and a pair of "freshly laundered" jeans that still had "a faint staining" on the knee. Detective Walker testified there was dog hair on the shin guards in the backpack.

Detective Ben Hagglund testified that the white plastic bag Oakes threw from his SUV contained a .22 caliber handgun manufactured by Browning Arms, a Ziploc bag containing a square of carpet cut from a larger piece of carpet, a receipt from Lowe's, some clothing tags, a bloody napkin, and a "balaclava" mask.

The manager at Ace Hardware in Winthrop, Bart Northcott, testified that Oakes purchased a .22 caliber Browning pistol on October 1, 2009. Ace Hardware employee

---

[4] The e-mail states:

I appreciate you meeting me and hanging out yesterday. It was great to hear more tidbits about the boys and I really hope that [M.T.] was stoked about his Cub Scout thing. I need to get rolling along here pretty quick but I thought I would tell you that I enjoyed our visit, particularly the polka playing art people. . . . Talk to you soon.

Andrew Hover testified that Oakes told him, "I really like them [.22 pistols], and I have a barrel that I can interchange on that that has a threaded end on it that you can put a suppressor on."

Veterinarian Lee Anderson testified that x-rays showed three bullets "in [Dingo's] nasal passage . . . on the left orbit, . . . left eye, and then up under the cervical region above the larynx and also below the larynx just under the skin."

The supervising forensic scientist for the WSPCL firearm and toolmark section, Richard Wyant, testified. Wyant said that the bullet casings found outside Stover's home were fired from the .22 caliber Browning. Wyant testified the bullet fragments recovered from Dingo had the same "class characteristics" as a bullet fired from Oakes' .22 caliber Browning. Wyant said that Oakes' Browning handgun had an interchangeable barrel. Wyant testified that Tactical Solutions, the company that sent Oakes an invoice on September 30, 2009, manufactures barrels with a threaded end that permits the user to "screw on either a flash hider or a sound suppressor."

Wyant testified that the bullet he recovered from Oakes' bulletproof vest was a .22 caliber bullet but he could not determine whether the bullet came from the Browning. Wyant testified that his findings were "inconclusive." Wyant said the bullet hole was "pretty much right in the middle of the vest" and the vest tested positive for gun powder. Wyant testified it looked like a "relatively close shot" and it struck him as "unusual" that the bullet "was right in the middle of the vest." Wyant said the .22 caliber bullet he recovered in the lining "never made it into the vest." Wyant also testified that a silencer can affect the markings on a bullet. At the conclusion of Wyant's testimony, the defense stipulated "that the casings that were found in this case came from the Browning" and

"the three bullet slugs found, which I believe came from the dog, . . . also were fired from the Browning."[5]

WSPCL forensic scientist Karen Green found blood on the back bumper of Stover's wagon, on the driver's seat, and on the carpet in the cargo area. Green testified there were several bloodstains on the SUV, including on the kick plate, the back hatch of the vehicle, and in the cargo area at a spot where a five-by-seven-inch square of carpet had been cut out.

WSPCL forensic scientist and DNA[6] expert Kristina Hoffman testified that the DNA profile obtained from the interior cargo door of Oakes' SUV matched Stover's DNA profile. Hoffman testified that the DNA profile obtained from the blood on the carpet in Oakes' SUV and from the blood on the carpet in Stover's bedroom also matched Stover's DNA profile.

The State also introduced into evidence the phone records from Verizon and AT&T for Oakes and Thompson on October 24 and October 28. The records for October 24 show a number of calls from Oakes to Thompson between 7:30 and 8:00 p.m. On October 28, Oakes sent Thompson a number of text messages beginning at 12:36 p.m. and called her at 1:23 p.m.

At the conclusion of the State's case in chief, the defense gave a lengthy opening statement describing the relationship between Opdycke and Stover and the harassment of Opdycke between December 2006 and 2007. The defense conceded there was no

---

[5] The court instructed the jury as follows:

Ladies and Gentlemen, when the attorneys stipulate to something that means they agree to a fact. So they are stipulating to the fact that the three casings that have been admitted into evidence at this point, that those three casings came from the Browning, .22, Benchmark .22 pistol. So they're stipulating that those casings came from that weapon. So that's not a . . . disputed fact at this point. It's agreed upon by both sides.

[6] Deoxyribonucleic acid.

22

contact between Stover and Opdycke after he was convicted of stalking in April 2008. The defense described the contacts between Stover and Oakes and asserted that on Wednesday, October 28, 2009, Oakes killed Stover in self-defense.

> And when Michiel Oakes testifies he will tell you how it is that he acted purely in self defense. He will explain to you how it is that his training in force on force combat saved his life that morning, and he will demonstrate to you how it is that Mark Stover died that morning and that Michiel Oakes was the only one to be able to walk away.

The defense attorney told the jury that after Oakes killed Stover, "the things [Oakes] did that day . . . make no sense."

> And, frankly, Michiel believes at that time there's no police officer who's going to believe what really happened.
>
> . . . .
>
> So you're going to hear Michiel testifying about the things that he did that day which make absolutely no sense, the things that he did that day which make no sense when compared with the obvious option of leaving out the back door and heading out into the woods and disappearing. He decides he's got to play for time. It's just a matter of time, but he's got to play for what time he can get in order to see those people [who mean the most to him] again.

Oakes testified that he was an expert in firearms, "shot competitively," and had written "over 230 . . . articles for gun magazines." Oakes said that he knew about interchangeable barrels and suppressors. Oakes testified that his Browning automatic .22 "accepted" a silencer. Oakes said "[j]ust the addition of a barrel is not bulky" but it would be "difficult to draw from a holster."

Oakes testified that shortly after he met Opdycke, she showed him all the documentation she had "regarding her stalking situation" with Stover. Oakes testified at length about Opdycke's concerns about Stover and the documentation she provided to him, including surveillance showing Stover at her house in Winthrop, the incident with John Bonica, the DVPO, the stalking conviction, and a risk assessment prepared by

23

John Hansen. In a September 15, 2009 statement from Hansen and the Hansen Investigation Agency, Hansen states that "Opdycke's personal safety continues to be at high risk."

The court instructed the jury that it could consider the evidence of Stover's behavior toward Linda Opdycke "only for the purpose of determining whether Mr. Oakes was aware of that alleged behavior and whether that awareness lead Mr. Oakes to a reasonable belief that he was in imminent danger of great bodily harm of Mr. Stover at the time of Mr. Stover's homicide."

Oakes said Opdycke told him Stover was "always armed with at least one firearm." Oakes testified Stover had no contact with Opdycke after the stalking conviction and he never told her about any contact that he had with Stover "up to and including October 28."

Oakes testified that in the early morning of October 28, he stopped at the Walmart in Mount Vernon in "preparation for my meeting with Mr. Stover." Oakes testified he had "looked at the Google Earth pictures of Mr. Stover's house, and it's surrounded by woods." Oakes said that he bought a camouflage sweatshirt and sweatpants because he was "very concerned about possibly needing to make some sort of on foot escape through the woods from [Stover] and his dogs." Oakes said he bought the anchor rope in the event he had to climb up the ladder of a nearby water tower he spotted on Google Earth. Oakes testified he bought the ankle weights to weigh down the rope. Oakes said he went to the water tower first and discovered there was a fence in the way. Oakes said he left the rope and ankle weights in the bushes.

Oakes testified that he parked in the church parking lot and walked to Stover's

house. Oakes wore a Kevlar vest and a black shirt and black jacket over the vest. Oakes carried the backpack and was armed with two firearms, a 9 mm handgun "at the small of [his] back" and a .22 caliber Browning pistol in a holster on his right side. Oakes testified that he went to Stover's house on October 28 hoping Stover "would say that he didn't care about the pictures anymore and I would just leave."

Oakes said he arrived at 7:00 a.m. and Stover, accompanied by his dog Dingo, opened the door, led him down the hallway, and told him to stand in the bathroom. Oakes said that after he told Stover he did not have the wedding photographs, Stover walked out to the carport with his dog, started the van, and then returned to the house.

Oakes testified that Stover came back inside without Dingo and asked about the photographs. According to Oakes, Stover was "very angry and very loud" and said, "You don't have the pictures." Oakes said that he told Stover, "I got in the safe and they weren't there." According to Oakes, Stover responded, "[S]he would have never gotten rid of them," then he "abruptly broke off and walked back out and back toward the main part of the house."

Oakes testified Stover then came around the corner with what he "believe[d]" was a revolver in his hand. Oakes said he was in the bathroom and Stover was "right at the doorway," about three feet away. Oakes testified, "I can't remember if he -- I lunged and he shot. We tangled and I got shot." Oakes testified Stover's gun fired two times. The first time, Stover shot him in the chest, hitting his bulletproof vest. Oakes testified, "I started out about three feet away. I don't know how much distance, if I closed any or if he shot before I started to move, or -- I do not -- it's a blur." Oakes testified, "I can't remember if he -- I lunged and he shot," but later admitted that he "lunged at [Stover]."

25

Oakes said that as he lunged at Stover, he "pulled the trigger," shooting Stover in "the head or neck," but he did not "actually see the wound."

Q. Just explain what you did.
A. You knock the gun -- try to knock the gun out of alignment. You --
Q. How do you do that?
A. With the opposite hand or the same hand, I guess, you knock the gun aside with -- with your own hand at the same time you're securing the -- the weapon and the wrist. And then -- and then almost like a wrist lock maneuver you lever their wrist and hand upward so that you can defer the muzzle from yourself.
Q. So you take your -- in this case, your right hand, whack his arm?
A. My left hand started it.
Q. Okay. Tell me which hand. I'm Mr. Stover. I'm holding a gun.
A. Um-hum. [S]o my left hand first hits the muzzle of his weapon. My right hand comes in, flex the wrist up.
Q. Which way do you take my wrist?
A. (Indicating).
Q. So you just turned it on him and pulled the trigger?
A. More or less, yes.
Q. Were his fingers still on the trigger?
. . . .
A. You know, I don't know.
Q. . . . Were you still in the bathroom when you pulled the trigger?
A. I don't think so.

Oakes said Stover landed face-up in the hallway. Oakes testified, "I took . . . my glove off my hand and touched his throat and he, he, he, he didn't have any pulse."

According to Oakes, he paced around then he moved the body to the bedroom to "have time to think."

Oakes said he did not clean up.

He wasn't even bleeding that I could see at that point. There wasn't anything to clean up that I could see. I put his gun on his chest and paced around for a little while. And then I heard the engine running for the car and I thought for some reason I needed to shut it off or something. And I went out the door.

Oakes said the van was gone when he came out of the house and he dragged the body from the house to the trunk of Stover's white station wagon. Oakes testified

that he put Stover's gun in Stover's vest pocket. Oakes said he decided to move Stover

"so no one calls the cops right away."

Oakes testified that when he went outside, the dog "was staring at me very, very

intently" and "making some sounds and kind of approaching. And so I drew the gun that

I had on my right side" and shot Dingo with the automatic Browning .22. Oakes testified

that the "hole in the bottom" of his holster accommodates the Browning .22 and silencer.

Q. What was the dog doing?
A. It was standing not far away from me and it was starting at me very, very intently and it, it was making some sounds and kind of approaching. And so I drew the gun that I had on my right side.
Q. Is that the first time you'd drawn your gun?
A. Yes.
Q. What gun was that you had on your right side?
A. The was the .22.
Q. Would that .22 have even fit in your holster with a silencer on it?
A. My holster has a hole in the bottom. It might. I don't know.
Q. Okay. So did you shoot Dingo?
A. Dingo came at me and I shot a couple times until it stopped coming at me. And then I stopped shooting and it — well, it stopped coming toward me and I stopped shooting.
Q. This is the Browning. So what side do the shell casings eject from?
A. The right side.
Q. Did you think to pick up your shell casings?
A. No.

Oakes also testified he saw "people walking around" and he was surprised no

one responded after he shot Dingo.

And I looked down the driveway and I see people walking around and I'm thinking, they should be coming up here. I mean, I just shot a gun and my ears were ringing from the shot in the carport. They should have come. So I think, well, they're going to come any minute now. I, I just need to go someplace and think about what to do about this.

Oakes put Stover's hat and coat on and drove away in the white station wagon.

Oakes testified that he "drove around" in Stover's white station wagon and was

"thinking about, how the heck can I get to my kids?" Oakes said he drove to the grange

27

and decided to park the station wagon there because it was within "walking distance back to my car." After he saw the chain across the back area, Oakes drove to Lowe's in the white station wagon to pick up some bolt cutters. Oakes said he then parked his Suzuki SUV and the white station wagon at the back of the grange. Oakes testified that he decided to move Stover's body from the white station wagon to his own car and leave the white station wagon parked at the grange. As he left the grange, he saw two women looking at him and writing down his license plate number.

Oakes said that he went back to the water tower and retrieved the anchor rope and ankle weights. After Deputy Duhaime stopped him, Oakes drove to Everett to meet Thompson and then drove to Mukilteo. Oakes said Stover was in the back of his SUV. Oakes denied telling Thompson he needed to be somewhere at 6:00 p.m. But at 6:20 p.m., Oakes drove Stover's station wagon to the Northern Lights Casino and left it in the parking lot. Oakes said he then drove his SUV to a dock near the casino and "dropped" Stover's body into the water with the gun in his pocket. Oakes testified he also threw the plastic wrap, the rope, the camouflage clothing, and the ankle weights into the water. Oakes testified that on the way back to Winthrop, he threw a number of other items away, including the black fleece jacket he wore. Oakes washed the bloodstained jeans when he got back to Winthrop.

Oakes testified that when officers arrived at Opdycke's home, he threw the plastic bag over the rock embankment because he "needed one more day. I, I was trying not to get arrested just yet." On cross-examination, Oakes testified that he thought the bag he threw over the embankment contained only the bloody bleach-soaked carpet square and not the gun. Oakes testified he was not worried about

28

officers finding the gun in his car because "I owned that gun legally. . . . [A] piece of bloody carpet would get me arrested right now. A gun that I own legally that they would eventually come and bother me about . . . -- I could get to my kids before they came and talked to me about that."

On cross-examination, Oakes testified that he scouted out the water tower on the Internet and left the rope and ankle weights there in case there was a "problem." Oakes said he carried the camouflage clothing in the backpack in case he needed to "make my escape through the woods to -- to the water tower, camouflage is quite useful for that." Oakes said he was wearing gloves in the house because he was cold. Oakes said he did not remember the sequence of events that day, but it "wouldn't surprise him" that he drove his Suzuki to the casino parking lot before Deputy Duhaime pulled him over. Oakes pointed out the location on the "dilapidated dock" where he threw Stover into the water. Oakes said he walked approximately 20 feet down the dock. Oakes said he was able to carry Stover down the dock.

Oakes admitted he used an interchangeable barrel for his Browning .22 and the Sparrow silencer. Oakes testified that there was no reason for Stover to know he was an expert in firearms or "about any of my training."

Oakes testified that there was no bleach smell in Stover's house, that he did not "use any bleach," and that he did not "attempt to clean up anything." Oakes said that when he got to Winthrop, he cut a piece of carpet out of the Suzuki because it smelled like blood. Oakes said he put it in the plastic bag to throw it away later.

Opdycke testified that Stover was a "very avid shooter" who owned well over 30 firearms, often carried 2 or 3 handguns, and always had a handgun on his nightstand.

29

Opdycke testified about the instances when Stover harassed and stalked her before March 2008. The court admitted into evidence a number of documents. A December 6, 2007 letter Opdycke wrote to the Okanagan County Sheriff states that Stover "has been going to my home against multiple requests to stay away from me," and "[a]s a matter of public safety please be advised that Mark Stover is usually armed with a concealed handgun." A June 23, 2008 letter from Opdycke to the Okanagan County District Court states that she is "very concerned that [Stover] is still in possession of firearms although the DVPO states he is not to be in custody of such." In a "Victim Impact Statement" Opdycke submitted in support of extending the DVPO, Opdycke states that Stover "will always be a threat to me" and she believes he "is mentally unstable." Opdycke states that she is "concerned that although the law and directives of the DVPO requires Mr. Stover to forfeit his firearms, of which he has many, no authorities have required him to do so to date." The court also admitted Hansen's statement.

Oakes' two daughters testified that at the end of the school year in 2009, Oakes seemed more cautious and jumpy, and in the fall, took his two youngest children out of school.

In rebuttal, the State called a number of Stover's clients who had regular training appointments with him in Seattle between 9:30 and 10:30 a.m. on Tuesdays and Wednesdays in 2009. Detective Meyer testified that the dilapidated dock near the casino was behind a fence barrier and was not "usable" or safe because of rot and fire damage. Detective Meyer testified that between 6:00 and 8:00 p.m. on October 28, 2009, there was an outgoing tide that by 8:00 p.m. was only four feet deep. Detective Meyer said that during the search of the channel, Skagit County police used a

submersible sonar scanner that produces a three-dimensional-type image and "[i]f there were a body," they would have "most likely" seen it. The coroner testified rigor mortis would have set in between two to four hours.

The court instructed the jury on self-defense.[7] After more than three days of deliberations, the jury found Oakes guilty of premeditated murder in the first degree.

After filing a notice of appeal, Oakes filed a CrR 7.8 motion to vacate the judgment, arguing juror misconduct deprived him of a fair trial and the preliminary appearance in the district court violated his right to counsel and public trial rights. We issued a stay pending resolution of the CrR 7.8 motion. The trial court held an evidentiary hearing and entered detailed findings of fact and conclusions of law denying the motion to vacate the conviction.

## ANALYSIS

Oakes contends the court (1) erred in denying his motion to suppress the warrantless seizure of the white plastic bag and its contents, (2) erred in permitting the State to use a previously suppressed text message for purposes of impeachment, and (3) violated his right to present a defense. Oakes also claims the State did not disprove his claim that he acted in self-defense beyond a reasonable doubt, juror misconduct

---

[7] Jury instruction 10 states:

It is a defense to a charge of murder that the homicide was justifiable as defined in this instruction.
Homicide is justifiable when committed in the lawful defense of the slayer when:
1) the slayer reasonably believed that the person slain intended to inflict death or great personal injury;
2) the slayer reasonably believed that there was imminent danger of such harm being accomplished; and
3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him at the time and prior to the incident.
The State has the burden of proving beyond a reasonable doubt that the homicide was justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

31

denied him a fair trial, and the preliminary appearance in district court violated his constitutional right to counsel and his public trial rights.

Motion to Suppress

Oakes contends the court erred in denying his motion to suppress the white plastic grocery bag containing a .22 caliber Browning pistol, the receipt from Lowe's, and the blood-soaked carpet from his SUV. Oakes asserts the warrantless seizure violated article 1, section 7 of the Washington State Constitution.

On appeal, Oakes argues he did not abandon the white plastic bag but, instead, "moved" the bag "from one place in which he has a right of privacy to another such place . . . to keep it private from law enforcement."

We review a trial court's decision on a motion to suppress to determine whether the findings are supported by substantial evidence and whether those findings, in turn, support the conclusions of law. State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). We defer to the trier of fact on "issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). Unchallenged findings of fact are verities on appeal. O'Neill, 148 Wn.2d at 571. We review conclusions of law de novo. State v. Johnson, 128 Wn.2d 431, 443, 909 P.2d 293 (1996).

Under the Washington Constitution, article I, section 7, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." A warrantless search violates article 1, section 7 unless it falls under one of " 'a few jealously guarded exceptions.' " State v. MacDicken, 179 Wn.2d 936, 940, 319 P.3d 31 (2014) (quoting State v. Afana, 169 Wn.2d 169, 176-77, 233 P.3d 879 (2010)).

Voluntarily abandoned property is an exception to the warrant requirement. State v. Evans, 159 Wn.2d 402, 407, 150 P.3d 105 (2007); see also State v. Reynolds, 144 Wn.2d 282, 287, 27 P.3d 200 (2001) (law enforcement may retrieve and search voluntarily abandoned property without a warrant or probable cause).[8] The determination of voluntary abandonment "is an ultimate fact or conclusion based generally upon a combination of act and intent." Evans, 159 Wn.2d at 408 (citing 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 2.6(b), at 574 (3d ed. 1996)). " 'Intent may be inferred from words spoken, acts done, and other objective facts, and all the relevant circumstances at the time of the alleged abandonment should be considered.' " Evans, 159 Wn.2d at 408 (quoting State v. Dugas, 109 Wn. App. 592, 595, 36 P.3d 577 (2001)). The fundamental question is whether the defendant relinquished his reasonable expectation of privacy by discarding the property. Evans, 159 Wn.2d at 408. The defendant bears the burden of showing that he had an actual, subjective expectation of privacy and that his expectation was objectively reasonable. Evans, 159 Wn.2d at 409.

A critical factor in determining whether abandonment has occurred is the status of the area where the searched item was located. State v. Hamilton, 179 Wn. App. 870, 885, 320 P.3d 142 (2014). "Generally, no abandonment will be found if the searched item is in an area where the defendant has a privacy interest." Hamilton, 179 Wn. App. at 885; Evans, 159 Wn.2d at 409. By contrast, "abandonment generally will be found if the defendant has no privacy interest in the area where the searched item is located." Hamilton, 179 Wn. App. at 886; Evans, 159 Wn.2d at 409-10. Another factor to

---

[8] "Involuntary abandonment occurs when property was abandoned as a result of illegal police behavior." Evans, 159 Wn.2d at 408. Oakes does not argue he involuntarily abandoned the bag.

consider is whether the defendant disclaimed ownership of the property. Hamilton, 179 Wn. App. at 885.

Sergeant Davis and Chief Rodriguez were the only witnesses who testified at the CrR 3.6 hearing. The court entered extensive findings of fact and conclusions of law. The court concluded Oakes voluntarily abandoned the white plastic bag by "suddenly pitching the bag over the embankment" and throwing the bag "from the curtilage into an open field area."[9]

The unchallenged findings and the record support the court's conclusion that Oakes voluntarily abandoned the white plastic bag and its contents by throwing what he described as garbage over the embankment "from the curtilage into an open field area."

When they arrived at Opdycke's house, Chief Rodriguez and Sergeant Davis told Oakes that "they were waiting for Skagit County to complete their application for a search warrant on [Oakes'] vehicle." Sergeant Davis went outside on the deck to get cell phone coverage to call Skagit County Detective Meyer. Shortly thereafter, Oakes told Chief Rodriquez, "I think I need to go out to the car and roll up my windows because it's raining." Chief Rodriguez said, "[I]t's not raining and I know that your windows are up because I checked." Oakes then "said something to the effect that he needed to find his pills" and "began walking and looking around the residence."

When "Chief Rodriguez's attention was then distracted by Ms. Opdycke," Oakes left the house "to go outside next to his Suzuki." Sergeant Davis saw Oakes "at the rear of his Suzuki, the hatchback door was open and he was holding a white plastic bag in his hand." Sergeant Davis immediately "terminated his phone conversation, came down off the deck, went to the defendant, and asked what he was doing." Oakes told

---

[9] The court also concluded exigent circumstances justified the search.

34

Sergeant Davis that "he was looking for medication and throwing some trash away. [Oakes] then threw the white plastic bag over an embankment and it tumbled down about 25 feet to the bottom of the embankment."

"The curtilage is that area 'so intimately tied to the home itself' " that it is entitled to the same protection as the home. State v. Ridgway, 57 Wn. App. 915, 918, 790 P.2d 1263 (1990) (quoting United States v. Dunn, 480 U.S. 294, 301, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987)).

> Curtilage questions are resolved with reference to four factors: (1) the proximity of the area claimed as curtilage to the home; (2) whether the area is included in an enclosure surrounding the house; (3) the nature of the uses to which the area is put; (4) the steps taken by the resident to protect the area from passersby.

State v. Johnson, 75 Wn. App. 692, 706 n.7, 879 P.2d 984 (1994) (citing Dunn, 480 U.S. at 301).

The court admitted into evidence a number of photographs showing the location of the residence, the embankment, and the open range. The photographs show that outside the rock embankment, the land is open range. The court ruled, in pertinent part:

> I'm also persuaded that -- I'm also aware of the fact that there is a difference between the residence, the curtilage, and the open fields. And I had a question about that this morning. And when I saw the pictures, if I had to delineate between the three, I would say, of course, we have Ms. Opdycke's home. Then we have a landscaped area which is that neatly trimmed driveway with that nice high rock embankment around it. [T]hen right off the high rock embankment it goes to what I would call open range, good old Okanogan open range, and that would be the open field. So that Mr. Oakes' pitching of the bag was from the curtilage into on open field area.
> MR. VOLLUZ: It was only halfway down the rocks.
> MR. BROWNE: It was on the rocks.
> THE COURT: He only got half way down the rock, but his attempt was, I think, probably to pitch it as far as he could.
> So I believe that that falls into the abandonment category and is not constitutionally protected as a citizens's [sic] righteous privacy interest in

35

the garbage can sitting on the curb or on the street waiting for the Monday morning garbage pick up.

Oakes asserts the finding that "[t]he landscaped area is the curtilage of the residence and beyond the embankment is open fields" is not a finding of fact but, rather, a conclusion of law that implicates the "open fields" exception rejected in State v. Myrick, 102 Wn.2d 506, 513, 688 P.2d 151 (1984). In context, finding of fact 3 does not support Oakes' argument. Finding of fact 3 describes the residence, the driveway, the rock embankment, and the open range beyond the rock embankment. Finding of fact 3 states, in pertinent part:

> Ms. O[p]dycke's residence has a driveway leading up to it and has areas to park vehicles next to it. The residence is further surrounded by a landscaped area. The landscaped area is surrounded by a rock embankment. Beyond the rock embankment is open range. The landscaped area is the curtilage of the residence and beyond the embankment is open fields.

The case Oakes relies on, State v. Boland, 115 Wn.2d 571, 800 P.2d 1112 (1990), is distinguishable. In Boland, the court held that officers unreasonably intruded into Boland's private affairs under article 1, section 7 by removing garbage from a closed trash container. Boland, 115 Wn.2d at 577-78; WASH. CONST. art. I, § 7. The other cases Oakes cites are also distinguishable. See State v. Hoke, 72 Wn. App. 869, 875, 866 P.2d 670 (1994) (no dispute about whether portion of yard was within curtilage of home); Gonzalez v. State, 588 S.W.2d 355, 360 (Tex. Ct. App. 1979) (stating without analysis that backyard was protected as property "immediately adjacent to a home"); Norman v. Georgia, 134 Ga. App. 767, 768, 216 S.E.2d 644 (1975) (contraband in a truck parked within 200 feet of the house and 100 feet of the barn within the curtilage).

Because the unchallenged findings support the conclusion that Oakes voluntarily

abandoned the white plastic bag, and Oakes cannot show he had an actual or subjective expectation of privacy or that any such expectation was objectively reasonable, we conclude the court did not err in denying the motion to suppress.[10]

Impeachment

Oakes contends the court erred by allowing the State to use a previously excluded text message to impeach Oakes. Oakes argues there was no direct conflict between his testimony and the text message. The record does not support his argument.

Pretrial, the court granted Oakes' motion to suppress evidence obtained from his computer, including text messages downloaded from his cell phone. During Oakes' testimony, the State argued it was entitled to introduce a copy of the text message exchange between Oakes and Thompson to impeach Oakes. The State asserted his testimony contradicted the text message. The court allowed the State to use the text message exchange between Oakes and Thompson on October 25, 2009 to impeach Oakes. The record supports the court's determination that because there was a discrepancy between the testimony of Oakes and the content of the text message, it was admissible for impeachment purposes.

The October 25, 2009 text message between Thompson and Oakes states, in pertinent part:

[THOMPSON:]    Going to sleep. . . wish you could somehow be here with me. Be safe. Praying for you. Good night, sweet boy.

[OAKES:]    Thank you. For everything. I am okay. Job failed. No pay or damage. :)

---

[10] Accordingly, we need not address whether the court erred in concluding exigent circumstances also justified the warrantless search.

[THOMPSON:]    Bummer [about] pay but [thanks] for update.[11]

On direct examination, Oakes testified about his discussion with Thompson on October 24 about the meeting he had scheduled for later that night.

Q.    Did you talk to Jennifer at all about any kind of job you had that night?
A.    I did.
Q.    What did you say?
A.    I said I was in the area because I had an important meeting.

Oakes testified he did not "imply to Jennifer in any way that there might be some money as a result of this meeting." In describing his recollection of the text he sent Thompson, Oakes said:

I think I said, my meeting went okay. And then [Thompson] said something back about a job or something and -- oh, that's right. I said the meeting didn't go okay. It didn't -- my meeting didn't go, or whatever. And she said something like -- I don't remember, something positive like oh, that's good. And I said, no, and I think it's been brought up a couple times, the expression is I'm texting and driving, and I know I'm not supposed to do that, but I think it was no job means no pay.

Oakes testified that he told Thompson that "maybe [he] could get her some money," but that he did not expect anyone to pay him for meeting with Stover on October 24.

We also note Thompson testified that when Oakes left her house at approximately 9:00 p.m. on October 24, he said that "he had some side work, a job that he was off to do, and that it was dangerous, and he was a little concerned." Thompson also testified that Oakes texted her later that evening or early the next morning to say, "[N]o worries. I'm safe. Job failed. . . . [B]ut no job means no pay."

Right to Present a Defense

Oakes argues the court erred by placing a temporal limitation on Opdycke's testimony about Stover's conduct and in excluding Meghan Mataya's testimony that

---

[11] Some alteration in original.

Stover told her he saw Oakes and Opdycke at the Costco in Kennewick, and that he asked her to go to Montana with him and carry a gun in August 2009. Oakes asserts the limitation on Opdycke's testimony and exclusion of Mataya's testimony violated his right to present a defense.

A defendant in a criminal case has a constitutional right to present a defense. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010); U.S. CONST. amend VI. But a defendant's Sixth Amendment right to present a meaningful defense is not unfettered—there is no constitutional right to present irrelevant or inadmissible evidence. Jones, 168 Wn.2d at 720; State v. Hudlow, 99 Wn.2d 1, 15, 659 P.2d 514 (1983); State v. Rehak, 67 Wn. App. 157, 162, 834 P.2d 651 (1992). The Sixth Amendment is violated "where a defendant is effectively barred from presenting a defense due to the exclusion of evidence." State v. Martin, 169 Wn. App. 620, 628-29, 281 P.3d 315 (2012).

"We review a trial court's decision to exclude evidence for abuse of discretion." State v. Franklin, 180 Wn.2d 371, 377 n.2, 325 P.3d 159 (2014) (citing State v. Perez-Valdez, 172 Wn.2d 808, 814, 265 P.3d 853 (2011). "An erroneous evidentiary ruling that violates the defendant's constitutional rights, however, is presumed prejudicial unless the State can show the error was harmless beyond a reasonable doubt." Franklin, 180 Wn.2d at 377 n.2 (citing State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985)).

Contrary to the assertion that the trial court placed a temporal limitation on Opdycke's testimony, the record shows that the defense proposed and agreed to the limitation.

Shortly before the defense case, the court heard argument on the admission of evidence related to Stover's prior threatening behavior toward Opdycke. The State argued that the defense could only present evidence that was not too remote in time. Defense counsel disagreed, arguing the case law did not support the State's position. The court agreed with the defense and expressed concern about imposing any limitation based on whether an incident was too remote.

> THE COURT:   If we were just talking about one or two incidences, maybe. I suspect that those incidences from 2006 on would not be so remote. You're going to have a harder time defining -- the problem with case law, it's a little bit like a lot of other documents that we live by --
> MR. BROWNE:   Reasonable.
> THE COURT:   -- they're hard to interpret because they don't give us the full definition. What does remote mean? One year? Two years? Ten years?

Defense counsel told the court that the defense was relying almost exclusively on incidents from 2006 forward. "So the Court knows, I think we're relying almost exclusively on incidents from 2006 on." The court then ruled, in pertinent part:

> I would say that's probably not too remote. . . . It's pretty reasonable. I would consider anything from 2006 to the date of alleged incident to be not too remote.
> MR. VOLLUZ:   Well, does it resolve everything?
> THE COURT:   Is it going to be this easy?
> MR. VOLLUZ:   I don't think so.
> MR. BROWNE:   I do.

After further argument over whether Oakes knew about specific incidents between Stover and Opdycke, defense counsel argued that Oakes' state of mind was "critical" to the "resolution of this case in a fair manner," and then conceded, "[W]e've already said, okay, we'll limit it. Believe me, <u>we could go before 2006 easily, but we've</u>

<u>agreed not to do that.</u>"[12]

The issue came up again at the beginning of Opdycke's testimony. Outside the presence of the jury, defense counsel stated Opdycke intended to testify about events that occurred in the summer of 2005, and asked the court if January 1, 2006 was "the line in the sand." The court reiterated that the defense proposed using the January 2006 date, and emphasized the need to make clear Oakes was aware of the incidents between Opdycke and Stover.

> And the thing that I'm worried about most at this point -- since the jury's gone -- is I'm aware Ms. Opdycke probably has lots of incidents to testify about post-2006 -- which is fine, we know that's going to happen, and these incidents occurred between her and Mr. Stover and we'll allow her to testify to those -- but I want to make sure before we just wander down that track and start hearing all of these incidents that they were incidents that Mr. Oakes was made aware of before October 28th.

The defense agreed that "we are limiting ourselves to just things that Mr. Oakes knew about." The court ruled, in pertinent part:

> Well, if [Oakes] was once told it and made aware of it, that's good enough. The fact that he didn't testify to it here -- we would have been here maybe a few more hours if we would have tried to get to that point. If he was told of it and they were post-2006 -- so at one point he had it, it went into, we'll call it, the gristmill in his mind, as far as his state of mind goes -- I'll allow it.
>
> I just want to make sure that occasionally we clear up the point that the reason we're going this -- the reason we're allowing Ms. Opdycke to talk about these incidents with Mr. Stover is because she related them to Mr. Oakes and Mr. Oakes was aware of them. If he wasn't aware of them, then we don't need the incidents to be testified in here in this case.
>
> MR. VOLLUZ: Got it.
>
> THE COURT: Okay. <u>And we also made the deal that because there was such a wealth of incidents, according to you guys, that we were only going to hear about ones that were post-January 2006, and everybody said, that's fine, there's plenty of things going on after January 2006, I'm good with that. So that was the deal, and it still is.</u>[13]

---

[12] Emphasis added.

[13] Emphasis added.

As part of the motion for a new trial, the defense argued the court erred by imposing a temporal limitation on Opdycke's testimony, "what I call the line in the sand that you drew over our objection." In support of the motion for a new trial, Oakes submitted for the first time a declaration from Opdycke describing two incidents that occurred before 2006. Opdycke states that in the summer of 2005, Stover pointed a gun at a homeless person on their property. Opdycke also states that in 2004 or 2005, Stover saw a group of people on their property and ran over with a gun to confront them. The group of people got in their boat and left. Stover then got in a boat, caught up to the trespassers, yelled at them, made them dump their clams, and threatened to sue.

At the hearing on the motion for a new trial, the court again pointed out that defense counsel proposed the 2006 time limit, and read into the record excerpts from the transcript from trial.

> Mr. Volluz says, so the Court knows, I think we're relying almost exclusively on incidences from 2006 on. That's the first time 2006 was uttered, and it was uttered by Mr. Volluz. . . . That means you agreed with 2006. It was brought up by your co-counsel, Mr. Volluz. <u>2006 never came from me. Line in the sand, yeah. It was drawn by you two</u>.[14]

The invited error doctrine bars Oakes from challenging the temporal limitation on Opdycke's testimony. "The basic premise of the invited error doctrine is that a party who sets up an error at trial cannot claim that very action as error on appeal and receive a new trial." <u>State v. Momah</u>, 167 Wn.2d 140, 153, 217 P.3d 321 (2009). The doctrine applies when a party takes affirmative and voluntary action that induces the trial court to take an action that the party later challenges on appeal. <u>In re Pers. Restraint of</u>

---

[14] Emphasis added.

42

Thompson, 141 Wn.2d 712, 723, 10 P.3d 380 (2000). "Even where constitutional rights are involved, invited error precludes appellate review." State v. Alger, 31 Wn. App. 244, 249, 640 P.2d 44 (1982).

Oakes also argues the court violated his right to present a defense by excluding the testimony of former Stover employee Meghan Mataya. The defense sought to introduce testimony that Stover told Mataya he had seen Opdycke and Oakes together at the Kennewick Costco, and that in August 2009, Stover asked Mataya to go to Montana with him and carry a gun.

The defense argued that Stover's statement to Mataya that he saw Oakes and Opdycke together at the Kennewick Costco was admissible to show Stover's state of mind and "his continued obsession with Linda." The defense also argued the testimony "is offered as corroboration of Mr. Oakes' version of events" and "places [Stover] at the Costco store where he eventually confronted Mr. Oakes, according to Mr. Oakes' testimony."

> What [Mataya] has reported is in the summer of 2009 Mr. Stover made an offhand comment to her that he had seen Linda Opdycke at the Costco in Kennewick, and her boyfriend was with her, and he is much shorter than she is, and there were also a couple of children present.

The State objected on the grounds that the statement is "being offered for the truth of the matter asserted. It is exactly hearsay." The defense conceded the statement was offered to show Stover was in Kennewick but argued the evidence rules

must give "way to the defendant's right to defense."[15] The court did not err in ruling the statement was inadmissible hearsay.[16]

Oakes also argues that the trial court erred by excluding Mataya's testimony that in August 2009, Stover asked her to go to Montana with him and carry a gun.

Below, defense counsel argued the testimony was admissible as a statement against penal interest under ER 804(b)(3) because the DVPO did not permit Stover to carry guns. The court rejected the argument that the statement was admissible under ER 804(b)(3).[17]

Defense counsel then argued that the court should allow Mataya to testify to rebut the testimony of previous witnesses "that Mr. Stover didn't have anything to do with firearms after the domestic violence protection order was entered. There are witnesses who have testified to that." The court ruled that Mataya "can testify . . . Mr.

---

[15] The court disagreed, ruling, in pertinent part:

I don't think you cited a bunch [of authority] because here's the problem with it, and it goes to the very guts of the hearsay rule, you've got a witness who is now Ms. Mataya, who may or may not be the most truthful person in the world or may be the most truthful person in the world. Let's say she is, for purposes of the argument, in any event, she comes in, she's going to testify to what an individual who is now deceased supposedly said to her a year ago, and that statement totally corroborates Mr. Oakes' statement that he was accosted by Mr. Stover in Kennewick. That's right to the guts of the hearsay rule; that's why we don't allow it. You can't cross examine it. Anybody can come in and say anything. Where would I draw the line?

[16] For the first time on appeal, Oakes also contends the statement is an "implied assertion." Accordingly, we need not address this argument. State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007) (party may assign evidentiary error on appeal only on specific ground made at trial). For the first time in his reply brief, Oakes also argues the court erred in excluding Mataya's testimony that Stover dropped some bullets in her car. We need not address arguments raised for the first time in a reply brief. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (issue raised for the first time in a reply brief is too late to warrant consideration).

[17] The court ruled, in pertinent part, "It's not relevant unless Mr. Oakes knows about the statement and it's part and parcel of the fear that is inherent in him at the time that he has the confrontation with Mr. Stover." After defense counsel told the court Oakes had "just clarified" in a Post-it note "that he did know that Meghan had said it," the court adhered to its decision.

The ruling stands. . . . I've never seen or heard of a case where somebody, i.e., the defense, has got in more information regarding the background and the character of the victim than in this case. It is way over the top. So I am very comfortable that I have not inhibited your defense in any way.

44

<u>Stover was known to carry guns. She worked for him during the time in question and the period. She can testify to that.</u>"[18] The court also ruled Mataya could testify that she saw Stover with a gun. "I would be leaning towards letting Ms. Mataya testify because of that that she did, in fact, see Mr. Stover with a gun." Nonetheless, Oakes did not call Mataya as a witness.

On appeal, Oakes does not argue, as he did below, that the testimony is admissible as a statement against penal interest. Oakes argues that the request to carry a gun is not hearsay because (1) it was offered to show Stover's state of mind, (2) it is admissible under <u>Mutual Life Insurance Co. of New York v. Hillmon</u>, 145 U.S. 285, 294-95, 12 S. Ct. 909, 36 L. Ed. 706 (1892) (statement of intent to travel to certain place admissible to show that he did make such a trip), and (3) it is not an "assertion" under ER 801(a) and (c).

But Oakes did not raise the argument that the testimony was admissible to show Stover's state of mind and that Stover was not complying with the DVPO until he filed his motion for a new trial. Oakes also argued for the first time in the motion for a new trial that "requests cannot be hearsay." Oakes may assign evidentiary error on appeal only on a specific ground made at trial. <u>Kirkman</u>, 159 Wn.2d at 926. Further, contrary to the assertion on appeal that excluding the evidence prejudiced his ability to rebut the testimony that Stover was complying with the DVPO, the record establishes the court ruled that Oakes <u>could</u> present testimony that Stover was known to carry guns and that Mataya saw him with a gun.

<u>Sufficiency of the Evidence</u>

Oakes claims the State did not disprove beyond a reasonable doubt that he

---

[18] Emphasis added.

acted in self-defense.

Evidence is sufficient to support a conviction if, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime. State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). We draw all reasonable inferences from the evidence in the prosecution's favor and interpret the evidence most strongly against the defendant. State v. Joy, 121 Wn.2d 333, 339, 851 P.2d 654 (1993); State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial and direct evidence are equally reliable. State v. Liden, 138 Wn. App. 110, 117, 156 P.3d 259 (2007). "We must defer to the jury on issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence." Liden, 138 Wn. App. at 117.

A criminal defendant bears the initial burden of providing evidence of self-defense. State v. Walden, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). Once the defendant produces some evidence of self-defense, the burden shifts to the State to disprove self-defense beyond a reasonable doubt. Walden, 131 Wn.2d at 473; see State v. Bolar, 118 Wn. App. 490, 509, 78 P.3d 1012 (2003) (citing Salinas, 119 Wn.2d at 201, for the sufficiency test to disprove self-defense in holding that the State had met its burden).

Here, the jury rejected the claim of self-defense and found Oakes guilty of premeditated murder in the first degree.[19] While the jury could have found the testimony of Oakes that he acted in self-defense credible, it was not required to do so.

---

[19] The court instructed the jury on self-defense and Oakes does not challenge the jury instructions.

The jury properly considered whether Oakes' description of what occurred on October 28 was credible. "Credibility determinations are for the trier of fact and cannot be reviewed on appeal." State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Viewing the evidence in the light most favorable to the State, the evidence established that Oakes believed Stover was a threat and planned to kill him. Oakes arrived at Stover's house at 7:00 a.m. on October 28 wearing a Kevlar vest and gloves, armed with two guns, and carrying a backpack with camouflage clothing and other items he had purchased earlier at Walmart. Oakes said Stover had a gun and shot Oakes in the Kevlar vest. Oakes demonstrated to the jury how he grabbed Stover's gun with his gloved hand then pulled the trigger and shot Stover with his own gun. Forensic scientist Wyant found a .22 caliber bullet in Oakes' bulletproof vest but could not conclusively state whether it was fired from the Browning. Wyant testified the bullet hole "right in the middle of the vest . . . , pretty square in the middle" was unusual.

The evidence and reasonable inferences from the evidence also show that after shooting Stover, Oakes used bleach to try to clean up, shot Stover's protection dog Dingo with his Browning .22 and silencer, then put on Stover's hat and coat as a disguise before loading Stover into the white station wagon and driving away. After moving the body into his SUV, Oakes arranged to meet with Thompson to show why he was in the area, and made incriminating statements to her about what he had done. Oakes testified that he disposed of Stover's body, Stover's gun, and all other evidence that could have corroborated his claim that Stover shot him and that he acted in self-defense. When Oakes arrived back at Opdycke's house in Winthrop, he attempted to dispose of the blood-soaked carpet from his SUV and washed his bloodstained jeans.

47

After the Okanogan police arrived the next day, Oakes threw away a plastic bag that contained his Browning .22 and the blood-soaked carpet.

Viewing the evidence in the light most favorable to the State, the evidence was sufficient to meet the State's burden of proving the absence of self-defense. See Camarillo, 115 Wn.2d at 71; State v. Gregory, 158 Wn.2d 759, 817, 147 P.3d 1201 (2006).

Juror Misconduct

Oakes argues that because juror misconduct violated his right to due process and a fair and impartial jury under article 1, section 22 of the state constitution and the Sixth Amendment to the United States Constitution, the court erred in denying his post-trial motion to vacate the conviction.

We review a trial court's decision on a motion to vacate a judgment for an abuse of discretion. State v. Hardesty, 129 Wn.2d 303, 317, 915 P.2d 1080 (1996). While a showing of juror misconduct gives rise to a presumption of prejudice, the State may overcome this presumption by showing that the misconduct did not affect the verdict. State v. Boling, 131 Wn. App. 329, 332, 127 P.3d 740 (2006).

After the trial, the court held a hearing on the defense motion to vacate the verdict. The defense argued that the juror's "tweets" on the social networking service Twitter violated the court's order not to discuss the case and showed the juror was incapable of following instructions. The court denied the motion to vacate and entered findings of fact and conclusions of law.

The unchallenged findings of fact support the conclusion that "[t]he tweets did not constitution [sic] juror misconduct," "[t]he tweets were not prejudicial," and "[t]he jury

48

was not influenced as a result of [the juror]'s tweets." The court found that the juror "has a Twitter account and tweeted from that account throughout the course of the trial," but "[h]e did not tweet from the jury box. He tweeted after hours, on the weekends, or otherwise on his own time." The court expressly found that "[t]he content of the tweets did not disclose anything that the jury was doing or any of his particular mindsets or ideas concerning his thoughts on the case," nor was the juror "exposed to any extraneous influences as a result of his tweets." The court found that "[a]lthough the tweets were in violation of this Court's instruction to not use the internet, the Court did not specifically instruct the jurors to refrain from 'tweeting'. The Court did not use the word 'tweet'." Because the court found the tweets did not address the substance of the trial, any misconduct did not affect the verdict.

The case Oakes relies on, Dimas-Martinez v. State, 2011 Ark. 515, 385 S.W.3d 238, is distinguishable. In Dimas, the trial court specifically instructed the jury not to tweet or post to Twitter. During the trial, the defense brought the tweets of the juror to the court's attention. The court instructed the juror to stop. Dimas, 385 S.W.3d at 246-47. But the juror continued to post messages, including his thoughts on the case during deliberations. Dimas, 385 S.W.3d at 247.

We conclude the court did not abuse its discretion in denying the motion to vacate.

Preliminary Appearance in District Court

Oakes argues the preliminary appearance in district court violated his constitutional right to counsel and his public trial rights.

49

On Thursday, October 29, 2009, Skagit County police officers arrested Oakes without a warrant. The following morning on Friday, October 30, Oakes appeared in district court on the 7:00 a.m. preliminary appearance calendar. The district court judge told Oakes that he was under investigation for murder, that he had been "in custody since 11:00 p.m. yesterday," that an affidavit of probable cause had been filed, and that bail was set at $500,000 "until 4:00 on Tuesday." The judge states that if no charges were filed, he would be released. The judge informed Oakes that he had the right to appointment of an attorney. Oakes told the district court judge he could afford an attorney. The district court judge told Oakes, "It will be up to you to contact an attorney."

> **JUDGE:** . . . There are no charges filed against you. There is an affidavit that has been filed with the court by the Skagit County Sheriff's Office that leads the court to believe that the alleged crime has been committed and you may have committed it. At this point in time you are being held in custody with the bail set at $500,000 . . . and it is bondable. Because you're being held in custody you do have the right to be assisted by an attorney. Do you want to be assisted by an attorney sir?
> **OAKES:** Yes please.
> **JUDGE:** Are you able to afford an attorney?
> **OAKES:** Yes sir.
> **JUDGE:** Okay, then I will refer you to private counsel. It will be up to you to contact an attorney. . . . Now if there's no charges filed against you by 4:00 p.m. on Tuesday...not just charges filed against you, that would also mean that there'd have to be a warrant issued to hold you in custody...but if those things don't happen, you'll be released at 4:00 on Tuesday without being required to post bail.[20]

On October 30, the State filed a criminal complaint in district court charging Oakes with second degree intentional murder. The district court issued a warrant of arrest and set bail of $5 million. The warrant was served on Oakes in jail.

---

[20] Emphasis in original, some alteration in original.

The next business day, Monday, November 2, Oakes appeared in district court on the 7:00 a.m. preliminary appearance calendar. The district court judge informed Oakes that the State had charged him with second degree murder, that bail was set at $5 million, and confirmed that Oakes was planning to hire his own attorney.

| | |
|---|---|
| JUDGE: | . . . [L]ast time I talked to you which was on Friday, you told me, I believe, if I recall correctly, that you were planning on contacting an attorney on your own. |
| OAKES: | Right. |
| JUDGE: | Now I don't know if that's [sic] changes. |
| OAKES: | No it has not sir. |
| JUDGE: | You're still planning to contact an attorney. |
| OAKES: | Right. |
| JUDGE: | Okay. Fair enough. And I know that I advised you of your rights on Friday, do you still recall those rights and have them in mind? The right to remain silent? |
| OAKES: | Absolutely, yes. |
| JUDGE: | The right to have an attorney represent you? |
| OAKES: | Yes Your Honor. Thank you. |
| JUDGE | Okay. Thank you sir. I'm gonna ask that you sign this document and you'll get a copy when you're returned up to the jail. It's the only notice you'll receive of the next hearing date and of what the bail is right now. Okay, thank you sir. |
| OAKES: | Thank you.[21] |

On November 4, a private attorney representing Oakes filed a notice of appearance and demand for discovery and a "Motion for Release on Personal Recognizance and/or Bail Reduction."

On November 13, the State filed an information in superior court charging Oakes with premeditated murder in the first degree. On November 25, 2009, Oakes entered a plea of not guilty. The court then held a hearing on Oakes' motion for release on personal recognizance or bail reduction. Several of Oakes' family members addressed the court. The court reduced bail to $2.5 million. After Oakes posted bail, the court released him pending trial.

---

[21] Emphasis in original.

Oakes contends the district court violated his right to counsel. The record does not support his argument. A person who cannot afford an attorney has the right to have counsel appointed at public expense. Gideon v. Wainwright, 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); CrRLJ 3.1(d)(1) ("a lawyer shall be provided to any person who is financially unable to obtain one").

Here, Oakes unequivocally states at the preliminary appearance on October 30 that he could afford and planned to retain a private attorney. In response, the court said, "Okay, then I will refer you to private counsel. It will be up to you to contact an attorney." At the November 2 hearing, Oakes again told the court he would retain counsel. Two days later, privately retained counsel filed a notice of appearance on behalf of Oakes and scheduled a contested bail hearing. Because the record establishes Oakes clearly stated he planned to retain private counsel and did not request assignment of an attorney at public expense, we conclude the preliminary appearance in district court did not deny Oakes his right to counsel.

Oakes also contends the preliminary appearance in district court violated his public trial rights. The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee a defendant the right to a public trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22 (amend. 10) ("[T]he accused shall have the right . . . to have a speedy public trial."); State v. Wise, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012). The right of a public trial is also vested broadly with the public. Wise, 176 Wn.2d at 9; WASH. CONST. art. I, § 10 ("Justice in all cases shall be administered openly."); U.S. CONST. amend. I. " 'Whether a criminal accused's constitutional public trial right has been violated is a question of law, subject to de novo

review on direct appeal.' " Wise, 176 Wn.2d at 9 (quoting State v. Easterling, 157

Wn.2d 167, 173-74, 137 P.3d 825 (2006)).

Oakes argues the court's findings do not support the conclusion that "[t]he district

court courtroom was not closed to the public during Oakes' hearings on October [30],

2009, and November 2, 2009." A "closure" of a courtroom occurs when "the courtroom

is completely and purposefully closed to spectators so that no one may enter and no

one may leave." State v. Lormor, 172 Wn.2d 85, 93, 257 P.3d 624 (2011). Substantial

evidence supports the court's conclusion that the "courtroom was not closed to the

public" during the hearings in district court on October 30 and November 2, 2009.[22]

The unchallenged findings state, in pertinent part:

7.   [The preliminary appearances] were held in the District Court courtroom located in the Larry Moeller Public Safety building. That building houses the Sheriff's Office, two District Court courtrooms, District Court Administration, and the Skagit County Jail. Courtroom 1 is the secure courtroom used for hearings involving defendants who

---

[22] The court's conclusions of law state:

1.   The district court courtroom was not closed to the public during Oakes' hearings on October [30], 2009, and November 2, 2009.
2.   A defendant's right to a public trial applies to adversarial proceedings. An adversarial proceeding includes presentation of evidence, suppression hearings, jury selections, and other hearings . . . .
3.   The right to a public trial does not apply to ministerial or purely legal proceedings.
4.   The 7:00 a.m. preliminary appearances in Oakes' case were not adversarial, but were ministerial in nature and were not required to be open to the public.
5.   The 7:00 a.m. preliminary appearance is not an adversarial proceeding nor is it a critical stage in the proceeding.
6.   The preliminary appearances in Oakes' case were not adversarial in nature.
7.   The preliminary appearances in Oakes' case did not involve the resolution of contested facts.
8.   Although the first hearing involved a bail determination, it was not, and was not meant to be, a contested bail hearing. In the second hearing, the magistrate advised Oakes of what bail had already been set on the warrant. Contested bail hearings occur at a later court appearance.
9.   The procedure used in the preliminary appearances did not significantly impair the policy in favor of open and public hearings. The hearings are recorded and part of the public record.
10.  The preliminary appearances in this matter did not constitute a critical stage of the proceeding. Therefore, Mr. Oakes's right to counsel was not denied at the 7:00 hearings.

are incarcerated. This building officially opens at 8 or 8:30 a.m. When it is open, the entry is staffed with security officers. During the 7:00 hearings, the building's outer doors are locked, the doors that lead to the courtroom's foyer are locked, and the courtroom itself is locked. There is a buzzer on the outside of the building. There is no sign describing the purpose of the buzzer. The 7:00 hearing is not reflected on any written court calendar or other notice, nor is its existence reflected in the court rules.

. . . .

9. Pamela Springer, the District Court Administrator, testified as to procedures and that she is under the impression that members of the public can punch the button and ask for admission and those members of the public have done so on at least several occasions. She said she has seen members of the public in the courtroom for 7:00 hearings although she did not know who those people were or what relationship they had to the defendants but that they were members of the public.

The court found that "members of the public can attend the 7:00 hearings, although it is very difficult to do so." The record supports the court's finding. District Court Administrator Springer testified that "I have been in the courtroom when there have been members of the public present." Springer testified that members of the public could access the hearings by pushing a button outside the building and asking the jail staff to let them into the building. Springer testified that "[a]nyone should be able to push the button and have a conversation with control room to be let into the building for a hearing," and that the buzzer system has been in place "for 27 years that I've been there."

Further, while violation of the public trial right is "structural error" and presumed prejudicial, here, there was no "structural" error. Wise, 176 Wn.2d at 13-14. The preliminary appearance calendar in district court does not affect " 'the framework within which the trial proceeds' " or render the criminal trial an improper " 'vehicle for determin[ing] guilt or innocence.' " Wise, 176 Wn.2d at 13-14 (quoting Arizona v.

54

<u>Fulminante</u>, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)). Here, the preliminary appearance in district court did not affect the function of the superior court trial " 'as a vehicle for determin[ing] guilt or innocence.' " <u>Wise</u>, 176 Wn.2d at 14 (quoting <u>Fulminante</u>, 499 U.S. at 310)).

We affirm.[23]

WE CONCUR:

---

[23] In a statement of additional grounds, Oakes argues the prosecutor's involvement in Stover's DVPO proceedings violated his right to a fair trial. In 2008, after reviewing a letter from Opdycke stating Stover violated the DVPO, the Skagit County prosecutor responded there was insufficient evidence to file charges. Oakes made the same argument in his motion for a new trial. We review the court's decision to deny a motion for a new trial for abuse of discretion. <u>State v. Burke</u>, 163 Wn.2d 204, 210, 181 P.3d 1 (2008). To prevail on a motion for a new trial, the defendant must show "that a substantial right of the defendant was materially affected." CrR 7.5(a). The court concluded the prosecutor's minor involvement in the DVPO proceedings did not affect the trial. We conclude the court did not abuse its discretion.

55